# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| **Mark Ramos,** | **Civil No. 13-1059 (ADM/JJG)** |
| **Petitioner,** | |
| **v.** | **REPORT AND RECOMMENDATION** |
| **Scott Fisher, Warden,** | |
| **Respondent.** | |

JEANNE J. GRAHAM, United States Magistrate Judge

This case is before the undersigned United States Magistrate Judge on pro se Petitioner Mark Ramos's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. The matter was referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. For the reasons set forth below, the Court recommends that the petition be denied.

## I.      Background

The United States District Court, District of Massachusetts, sentenced Petitioner Mark Ramos to 188 months' imprisonment and 96 months' supervised release for conspiracy to distribute heroin, in violation of 21 U.S.C. § 846, and distribution of heroin and possession of heroin with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). (Groteboer Decl. ¶ 3, June 6, 2013, ECF No. 6.) Petitioner was initially confined at a Federal Medical Center in Massachusetts ("FMC-Devens") from August 30, 2006, to October 9, 2009. (*Id.*) He was then moved to FMC-Devens Camp Satellite Camp ("FMC-Devens Camp") and remained there until February 11, 2011, when he was transferred to the Federal Correctional Institute in Sandstone,

Minnesota ("FCI-Sandstone"). (*Id.*) He arrived at FCI-Sandstone on May 3, 2011. (Groteboer Decl. Attach. K.) The events at issue relate to his time at FMC-Devens Camp.

### A.    The Search and Subsequent Investigation at FMC-Devens Camp

On April 28, 2010, a maintenance mechanic supervisor at FMC-Devens Camp was working in the inmate shower area when he discovered a cloth bag containing a cellular telephone and telephone charger behind a valve cover. (Groteboer Decl. Attach. B.) The worker notified the operations lieutenant, and a number of Bureau of Prisons ("BOP") staff members, including Correctional Counselor Jason Nelson, searched and secured the area. (Groteboer Decl. ¶ 5 & Attach. B.) A thorough search of the shower area uncovered seventeen cellular telephones and other prohibited items. (*Id.* Attach. B.) The items were subsequently moved to the office of the Special Investigative Supervisor ("SIS"). (*Id.*)

Following this search, Petitioner was placed in the FMC-Devens Camp Special Housing Unit on April 29, 2010, segregating him from the general prison population. (Groteboer Decl. ¶ 6 & Attach. C.) The Administrative Detention Order states, "[Petitioner] is placed in Administrative Detention pending an SIS investigation for phones." (*Id.* Attach. C.) A subsequent SIS memorandum states that two numbers from a Nokia cellular telephone ("the Nokia") found in the shower search matched entries in Petitioner's prison telephone number list. (*Id.* Attach. D.) This conclusion was reached by comparing the Nokia's saved contact data with the records of TRULINCS, the inmate telephone system. (Groteboer Decl. ¶ 7.) Two of the numbers saved in the Nokia were found only on Petitioner's TRULINCS records. (*Id.* Attach. F.) The SIS then referred the matter to the Federal Bureau of Investigation ("FBI") for a criminal investigation. (*Id.*)

The FBI notified FMC-Devens Camp on September 21, 2010, that they were declining to criminally prosecute Petitioner. (Groteboer Decl. ¶ 9.) SIS Technician D. Reynoso subsequently

drafted an incident report charging Ramos with violations of Codes 108 and 297 of the Inmate Discipline Program. (*See id.* Attach. F.) Code 108 prohibits, among other things, the possession of a cellular telephone while confined in a federal prison, and Code 297 prohibits the use of a cellular telephone to circumvent the BOP's telephone monitoring system. 28 C.F.R. § 541.3. SIS Lieutenant A. Paliotheodoros delivered the report to Petitioner on September 22, 2010. (Groteboer Decl. Attach. F.) Lieutenant Paliotheodoros read the report to Petitioner, advised him of his rights, and interviewed him. (*Id.*) Lieutenant Paliotheodoros averred that "the incident report is true and accurate as written" (*id.*), and it was referred to the Unit Discipline Committee ("UDC") for further action (*Id.*).

### B.     Proceedings Before the Unit Discipline Committee

Petitioner appeared before the UDC, which consisted of Correctional Counselor Nelson and Unit Manager Carrie Hunton, on September 24, 2010. (Groteboer Decl. ¶ 12 & Attach F.) Having been advised of his rights, Petitioner affirmed that the two numbers found in the Nokia were also on his TRULINCS account. (*Id.* Attach. F.) However, he denied ownership of the Nokia and expressed a lack of knowledge as to how those numbers came to be on the telephone. (*Id.*) After the hearing, the UDC recommended loss of good-conduct time, loss of telephone privileges and TRULINCS for one year, and transfer to a secure facility. (*Id.*) The UDC referred the incident report to the Discipline Hearing Officer ("DHO") based on the "serious nature" of the charges; evidence provided within the incident report, especially cellular telephone records; and the Prisoner Litigation Reform Act Guidelines. (*Id.*)

Upon referral, the DHO requested that SIS Technician Reynoso rewrite the body of the incident report to clarify the report with more information. (Groteboer Decl. ¶ 13 & Attach. G.) The revised incident report, dated September 29, 2010, was then delivered and read to Petitioner by Lieutenant Paliotheodoros later that day. (*Id.*)

3

After the revised report, Petitioner appeared again before the same UDC, on October 6, 2010. (Groteboer Decl. ¶ 14.) The UDC advised Petitioner of his rights and explained the reason for the seven-day delay between Petitioner's receipt of the revised report and the second UDC hearing. (*Id.*) The UDC also provided Petitioner a copy of a memorandum by the warden explaining the reason for the delay. (*Id.*) Petitioner again denied ownership of the cellular telephone and expressed a lack of knowledge as to how some numbers from his TRULINCS account were recorded in the Nokia's data. (Groteboer Decl. ¶ 14 & Attach. G.) Petitioner admitted placing the two telephone numbers in question onto his TRULINCS account. (Groteboer Decl. ¶ 14.) The UDC recommended the same sanctions as it had previously, citing the same reasons in its referral of the matter to the DHO. (*Id.*) Petitioner was also provided the "Inmate Rights at Discipline Hearing" form and a "Notice of Discipline Hearing Before the DHO." (*Id.* Attach. H.)

### C.     Proceedings Before the Discipline Hearing Officer

The DHO hearing was conducted the next day, October 7, 2010. (*Id.* Attach. I.) After the hearing, a report was written that discussed the delays caused by the FBI investigation and revision of the incident report, and concluded that these delays did not cause Petitioner "any undue hardship in [his] ability to defend [him]self at this hearing." (*Id.*) Petitioner nevertheless objected to the timeliness of the hearing as a per se violation of his due process rights. (*Id.*) The DHO heard Petitioner's responses as to how these delays may have caused him difficulty in defending his case, but found these insufficient to show hardship. (*Id.*) The DHO determined, by "the greater weight of the evidence," that the Petitioner violated Code 108 but dismissed the Code 297 violation without explanation. (*Id.*)

When analyzing the Code 108 violation, the DHO cited the incident report and Petitioner's testimony. (*Id.*) The DHO found that the Nokia was discovered during the April 28,

2010 search and that it contained two numbers present on Petitioner's TRULINCS account. (*Id.*) The DHO cited the findings contained in the incident report and deduced that in order for the numbers found only on Petitioner's TRULINGS account to also be in the phone, Petitioner must have possessed the phone at some point in time. (*Id.*) The DHO also cited a memorandum from July 17, 2007, notifying the prison population that possession of a cellular telephone would constitute a violation of Code 108. (*Id.*) The DHO therefore concluded from these findings that "[Petitioner] circumvented routine telephone monitoring procedures by possessing and utilizing an unauthorized source to place telephone calls." (*Id.*)

The DHO also considered evidence in favor of Petitioner, including Petitioner's denial of the ownership of the Nokia, his assertions that he had no knowledge as to why the telephone contained those particular numbers, and Petitioner's "Affidavit of Truth in Support to [sic] Dismiss." (*Id.*) The DHO discussed how the Nokia also contained a telephone number recorded in the TRULINCS account of Petitioner's brother who was incarcerated at FMC-Devens Camp from August 30, 2006, to October 9, 2009. (*Id.*) However, Petitioner's brother had no personal access to the compound where the Nokia phone was discovered. (*Id.*)

Finding that Petitioner had committed a violation of Code 108 by possessing a cellular telephone, the DHO imposed a sanction of forty days of lost good time, thirty days of segregation, and a six-month loss of telephone and visitation privileges. (*Id.*) The DHO report included notification of Petitioner's right to appeal. It was signed on October 19, 2010, and was delivered to Petitioner on October 20, 2010. (*Id.*) The notification stated that Petitioner had "[twenty] calendar days" to submit an appeal. (*Id.*)

### D.    Petitioner's Attempts at Appeal

Petitioner subsequently sought review of the case. (*See id.* Attach. J, K)  Petitioner alleges that he began the appeals process with the Northeast Regional Office while he was at

FMC-Devens Camp. (*Id.* Attach K.) In his petition, Petitioner states that he gave his BP-10 appeal form on October 25 or 27, 2010, to Unit Manager Hunton, as she was doing administrative rounds. (Pet. 3, 10, May 6, 2013, ECF No. 1.) However, Hunton avers that the log book establishes she did not complete administrative rounds on either of those dates. (Hunton Decl. ¶ 5 & Attach. A, June 6, 2013, ECF No. 5.) The closest date on which she conducted administrative rounds was October 28, 2010. (*Id.*) She does not recall whether Petitioner gave her a BP-10 form for delivery to the mail room, but contends that, in any case, it would have been delivered to the mail room if it were given to her or any other member of the unit team. (Hunton Decl. ¶¶ 5-6.) Hunton stated that when Petitioner inquired as to the status of his BP-10 appeal, she requested that he submit a "cop-out," an official Inmate Request to Staff, which Petitioner did submit on or after November 8, 2010. (*Id.* ¶ 7.) Although the date listed on the "cop-out", October 8, 2010, is incorrect because that was before Petitioner even received the DHO's report, Hunton nonetheless replied to the "cop-out" on November 17, 2010. She informed Petitioner that there was no receipt establishing that the Regional Office had received the appeal form. (*Id.* ¶ 8.) No further action was taken, and to her knowledge Petitioner never requested that she resend the form or that she assist him in establishing a valid reason for his delay. (*Id.* ¶ 9.)

The activity of Petitioner's appeal was officially tracked by the Administrative Remedy Generalized Retrieval Database. (Groteboer Decl. Attach. J) According to their records, the first appeal received by the Northeast Regional Office was not until July 15, 2011. (*Id.*) It was rejected on July 18, 2011, because Petitioner "submitted [his] appeal to the wrong regional office." (*Id.*) The denial included instructions to re-submit the appeal to the North Central Regional Office. (*Id.*) Petitioner proceeded to submit another appeal to the same office, and the appeal was similarly rejected. (*Id.*)

Petitioner subsequently submitted an appeal to the North Central Regional Office, and it was rejected on the same day as untimely. (*Id.*) The report indicated, "You received your DHO Report on 10-20-10. You are untimely." (*Id.*) Petitioner's next appeal was received on September 22, 2011, and rejected on October 5, 2011, because the previous appeal had been rejected as untimely. (*Id.*) The report stated, "You must provide staff ver[ification] on BOP letterhead stating that the late filing was not your fault to the correct region." (*Id.*) Petitioner solicited such documentation, and a counselor sent a memorandum describing how the counselor had instructed Petitioner to "continue the appeal process with the Northeast Regional [O]ffice since it was started in that region." (*Id.* Attach. K.) Petitioner submitted another appeal on November 2, 2011. (*Id.* Attach. J.) That appeal was denied on November 9, 2011, and stated, "You had 20 days from receipt of DHO Report 10-20-10 to file BP-10 or 11-9-10. You were at FMC-Devens Camp until 2-11-11. Didn't file BP-10 until 7-15-11." (*Id.*)

Petitioner filed this 28 U.S.C. § 2241 petition on May 6, 2013. (Pet. at 1.) He believes his right to due process was violated and he is not guilty of the Code 108 violation. (*Id.*) Therefore, he requests that the Court expunge his record of these claims, restore lost good-time credit, and issue a writ of habeas corpus to effect his transfer to a federal prison camp in the BOP's North Eastern Region. (*Id.* at 1-2.) In the alternative, Petitioner requests that the Court order a rehearing. (*Id.* at 2.)

## II.    Discussion

The Court has jurisdiction over this habeas corpus action under 28 U.S.C. § 2241(a), because Respondent Scott Fisher is warden at FCI-Sandstone, in the District of Minnesota, where Petitioner now resides, and he alleges continued unlawful execution of his sentence. *See Braden v. 30th Judicial Cir. Ct.*, 410 U.S. 484, 494-95 (1973) ("The writ of habeas corpus does not act upon the prisoner who seeks relief, but upon the person who holds him in what is alleged

to be unlawful custody." (citing *Wales v. Whitney*, 114 U.S. 564, 574 (1885))). However, this Court recommends that his Petition be denied on the bases that (1) Petitioner cannot justify his failure to exhaust his administrative remedies, (2) the BOP did not infringe on his due process rights, and (3) a cellular telephone is a "hazardous tool" within the meaning of Code 108. The Court discusses each below.

### A.       Failure to Fulfill the Exhaustion Requirement

First, Respondent argues that Petitioner has failed to exhaust all administrative remedies before seeking relief in the federal courts on a § 2241 habeas corpus petition. The Court agrees. Federal courts recognize a judicially imposed exhaustion requirement on petitioners for habeas corpus actions, including § 2241 actions. *See United States v. Chappel*, 208 F.3d 1069, 1069-70 (8th Cir. 2000) (dismissing inmate's challenge to a denial of pretrial credit because inmate filed a federal claim before exhausting administrative remedies within the BOP); *Willis v. Ciccone*, 506 F.2d 1011, 1015 (8th Cir. 1974) (requiring exhaustion of administrative remedies before review of inmate's habeas corpus petition). "In determining whether exhaustion is required, federal courts must balance the interest of the individual in retaining prompt access to a federal judicial forum against countervailing institutional interests favoring exhaustion." *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992).[1]

The administrative remedies available in a DHO determination for loss of good-conduct time reflect the BOP's administrative process generally. *See* 28 C.F.R. § 542.10-19. An inmate must ordinarily submit an initial appeal to the Regional Director within twenty days of the date

---

[1] *McCarthy* has been superseded by statute to the extent that it held that federal prisoners seeking money damages in a *Bivens* action are not required, under 42 U.S.C. § 1997(e), to exhaust BOP administrative remedies, but the Seventh Circuit has noted that *McCarthy*'s holding relating to the exercise of judicial discretion when exhaustion is not statutorily mandated, and the Supreme Court's "admonitions on how that discretion should be utilized," remains good law. *Gonzalez v. O'Connell*, 355 F.3d 1010, 1016 (7th Cir. 2004).

on which the inmate received written notice of the DHO's decision. *Id.* § 542.15(a). If an inmate is not satisfied by the Regional Director's response, he may submit an appeal to the General Counsel. *Id.* Response from the General Counsel completes the internal appeal process. *Id.*; *Rivero v. Fisher*, Civ. No. 08-3045, 2011 WL 1262139, at *4 (D. Minn. Feb. 18, 2004). It is important to note that the exhaustion requirement is applied strictly. *See, e.g.*, *Terry v. Fondren*, Civ. No. 08-1059, 2008 WL 5071077, at *4 (D. Minn. Nov. 24, 2008) (denying petition because petitioner did not appeal to the relevant offices in the proper order).

Here, although Petitioner availed himself of several available resources, procedures, and remedies during and after his disciplinary proceedings, he failed to follow the first BOP requirement of filing an appeal within twenty days. The DHO report notified Petitioner that he had twenty days to submit an appeal. (Groteboer Decl. Attach. I.) That report also referenced the Administrative Remedy Procedure that would have further clarified this requirement. *Id.*; *see also* 28 C.F.R. § 542.15. Petitioner did not submit an appeal within twenty days, despite having been notified of his appeal rights. His first appeal was filed on July 15, 2011, almost nine months after Petitioner received the DHO Report. Therefore, Petitioner did not exhaust the administrative remedies available to him.

### B.    No Justification for Failure to Fulfill Exhaustion Requirement

In determining that Petitioner did not exhaust his administrative remedies, the Court has carefully considered each of the reasons Petitioner sets forth for failing to do so. For example, Petitioner argues that his segregation in the FMC-Devens Camp Satellite Camp and subsequent transport to FCI-Sandstone prevented him from submitting an appeal within the allotted time period. The Court will construe his argument as a lack of proper access to the court. Regarding access-to-courts claims, the Supreme Court has held that a "plaintiff must 'demonstrate that a non[-]frivolous legal claim has been frustrated or was being impeded.'" *Johnson v. Missouri*, 142

9

F.3d 1087, 1089 (8th Cir. 1998) (quoting *Lewis v. Casey*, 518 U.S. 343, 353 (1996)). To have standing to bring such a claim, an inmate must show that court access has "actually" been impeded, not simply that it "could" have been impeded. *Lyon v. Krol*, 127 F.3d 763, 765 (8th Cir. 1997). In this case, Petitioner has failed to demonstrate that he was actually impeded from filing a timely appeal.

Petitioner argues that his delay is forgivable because he was impeded from filing a timely claim due to segregation placement and transfers. As to the latest of these events, Petitioner was transferred to Minnesota in February of 2011, arriving in May. Still, he did not submit his appeal until July 2011. So even if there was any delay due to time spent in segregation or transfer, there was still plenty of time and opportunity for Petitioner to make an appeal in a reasonably timely fashion with a valid explanation for the delay.  He did not. There is simply no credible evidence that he was actually impeded from filing his appeal in a timely fashion.

Similarly, he argues that he gave his appeal form to Unit Manager Hunton soon after he received the DHO ruling and, therefore, presumably any delay was due to prison failures. While the details of what happened cannot be substantiated, even assuming Petitioner did so, he was notified on November 17, 2010, that there was no receipt verifying that the Regional Office had received the appeal form. Yet, Petitioner apparently made no efforts to resubmit the form or seek substantiation that he had a valid reason for his untimeliness.

Next, Petitioner argues that his late appeal is excusable because submitting an appeal would have been futile. He claims that Special Investigation Agent Brown ("SIA Brown") told him that Petitioner's appeal would never leave FMC-Devens Camp, because SIA Brown would intercept it if Petitioner filed. (Pet. at 3.) Petitioner allegedly reported SIA Brown's statements to Unit Manager Hunton, who supposedly took no action regarding Petitioner's allegation. (*Id.*)

10

Petitioner argues that this effectively left him without an opportunity to mail his appeal while at FMC-Devens Camp.

It is true that exhaustion is not required when the pursuit of administrative remedies would be futile. *See Willis*, 506 F.2d at 1014-15 (noting that habeas claims are available "only after administrative procedures which provide a real possibility for relief have been exhausted"); *see also Young v. Caraway*, Civ. No. 05-1476, 2006 WL 562143, at *2 (D. Minn. Mar. 7, 2006) ("Exhaustion is not required, however, when the pursuit of administrative remedies would be futile.").

In this case the Court has carefully reviewed the record and finds no factual basis to substantiate this allegation. Moreover, Petitioner did not file a formal grievance addressing SIA Brown's alleged remarks. Also, even if the bald assertions had any substantiation, any such threats would only establish that his access *could* have been impeded, not that they were actually impeded.

Additionally, Petitioner's appeal would still be untimely. Petitioner arrived in FCI-Sandstone, where the threat of futility no longer loomed over Petitioner's appeal, on May 3, 2011. Petitioner should have filed an appeal as soon as possible after arriving there. Instead, the Northeast Regional Office received Petitioner's first recorded appeal on July 15, 2011, forty-three days after he arrived at FCI-Sandstone. Therefore, this claim falls short of a valid justification for delay, even if the allegations were corroborated.

###### C.    Due Process Considerations for Good-Time Credit

Despite the Petitioner's failure to fulfill the exhaustion requirement, the Court, in an abundance of caution, will continue to the merits of the Petitioner's claims. A court may proceed to the merits of the petition without regard to the exhaustion requirement because "the

exhaustion prerequisite for filing a 28 U.S.C. § 2241 petition is judicially created, not jurisdictional." *Lueth v. Beach*, 498 F.3d 795, 797 n.3 (8th Cir. 2007).

Petitioner argues that the BOP did not afford Petitioner sufficient due process in its determination of loss of good-time credit. Prison disciplinary proceedings depriving an inmate of good-time credit must comport with the minimum requirements of procedural due process. *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). These "minimum requirements of procedural due process" arise out of the interplay between a prisoner's liberty interest in good time credit and the "restrictions imposed by the nature of the regime to which [the prisoner] ha[s] been lawfully committed." *Id.* at 556, 558. The Supreme Court subsequently elaborated on the specific procedural requirements for determinations of loss of good-time credit:

> Where a prison disciplinary hearing may result in the loss of good time credits, *Wolff* held that the inmate must receive: (1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action.

*Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 454 (1985). The Court also imposed a requirement that findings of the prison disciplinary board must also have support from "some evidence" in the record, which exists when "there was some evidence from which the conclusion of the administrative tribunal could be deduced." *Id.* at 455(quotation omitted). The rule clarified in *Hill* applies to this DHO hearing, because hearings regarding Code 108 violations commonly result in the loss of good-conduct-time credits. *See id.* at 454; *see also* 28 C.F.R. § 541.3(b) (permitting loss of good time as a sanction for committing prohibited acts).

Here, the BOP fulfilled the minimum requirements of procedural due process established in *Wolff*. First, the BOP provided Petitioner with written notice of every hearing, and Lieutenant Paliotheodoros read each of those notices to Petitioner and recited Petitioner's rights. Second, the

DHO informed Petitioner that he was free to call witnesses and present written evidence, which Petitioner did in part. And third, the DHO provided a report detailing the DHO's reasoning and conclusions for the Code 108 violation, and Lieutenant Paliotheodoros delivered and read this report to Petitioner.

As for the requirement of evidence, the DHO's determination was certainly based on "some evidence," *Hill*, 472 U.S. at 455 (quotation omitted). The Court need not examine the entire record but must ascertain whether "any evidence in the record . . . could support the conclusion reached by the disciplinary board." *Id.* at 455-56.

Based on the incident report, the DHO considered evidence submitted, including documents, photos, staff memoranda, and explanations supplied by the Petitioner. The DHO found that two phone numbers on the cell phones found in an area accessible to Petitioner were linked to Petitioners' usage and to his TRULINCS account. The DHO determined that the cell phone must have been possessed by Petitioner in order for those two phone numbers to be on the cell phone, as those numbers were not found on any other inmate's TRULINCS account within the BOP. Additionally, although additional numbers were found on the cell phone, only one other number was linked to an inmate in the BOP, and that inmate did not have access to the location where the phone was found. This is certainly enough evidence for the DHO to conclude that Petitioner violated Code 108 by possessing the cell phone.

**D.      Due Process Complaints Related to the Discipline Hearing Officer**

Petitioner makes numerous arguments related to his due process rights at the DHO hearing. For example, Petitioner argues that the DHO improperly denied his request for exculpatory evidence, such all the records from the phone and fingerprint evidence, which he argues would have changed the outcome. (Ramos Decl. 9-D, Sept. 30, 2010, ECF No. 2.).  The Fifth Amendment requires administrative authorities to provide an inmate undergoing

disciplinary proceedings with the ability to access and present exculpatory evidence. *Wolff*, 418 U.S. at 566. The Supreme Court stated in *Wolff* that "[p]rison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence." *Id.* This language is very inclusive. *Id.* at 566-67.

On the foundation of *Wolff*, the record here evidences no irregularity in the DHO's denial of what Petitioner hoped would be exculpatory evidence. Importantly, in the due process context, the DHO did allow Petitioner to make, and the DHO considered, Petitioner's arguments that he did not know how the numbers got on the Nokia and that the numbers could have been placed there by someone else. The DHO simply did not agree with his arguments. Moreover, the evidence Petitioner sought would not have tended to exculpate Petitioner.

For example, determining the number of saved telephone numbers on the Nokia, or the dates when calls may have been made through all the phone records, would not overcome the DHO's finding that there *were* phone numbers on the phone that were *uniquely* connected to Petitioner. Also, the presence or lack of fingerprints on the Nokia would not have affected the DHO's conclusion that Petitioner must have been in possession of the Nokia at some point in time for those particular numbers to be saved within its contact information.

The DHO has the right to limit the extent of the hearing, but they gave Petitioner leeway to present his case. They considered Petitioner's side of the story, in addition to evidence of other numbers in the phone. They reached a conclusion based on the evidence found on the Nokia, in combination with Petitioner's access to the area where the phone was located. Evidence that someone else may have *also* have used the phone would not change the result that the contraband phone was connected specifically to Petitioner. A disagreement as to the conclusions made by

the DHO on the evidence does not equate to a lack of due process. Therefore, the DHO's denial of further evidence requested by Petitioner was not improper.

Petitioner further argues that the DHO was not impartial because it knowingly relied on the UDC's recommendations, even though one of its participants, Correctional Counselor Nelson, was unauthorized to be part of the UDC. (Pet. at 9.) Petitioner claims that Nelson evinced personal bias because his recommendations were based on his own findings during the investigation. (Reply 6, June 27, 2013, ECF No. 8.) Specifically, Petitioner argues that barring Nelson's participation may have resulted in different UDC sentencing recommendations and, thus, a different sentence from the DHO. (Pet. at 7.) It is true that BOP guidelines state that a staff member who was witness to an incident should not be part of the UDC. 28 C.F.R. § 541.7(b).[2]

Here, it is likely that Nelson should not have been part of the UDC, as arguably he was a witness to the incident and its subsequent investigation. Nevertheless, Nelson's participation did not result in prejudice to Petitioner. The violations alleged in Petitioner's case are automatically referred to the DHO, who independently reviewed the matter without Nelson's participation. Moreover, the UDC's and DHO's recommended sentences comport with the BOP's guidelines on disciplinary measures for a 100-level Code violation. *See id.* § 541.3. Thus, Nelson's participation, while raising the specter of partiality at the UDC level, does not undermine the due process Petitioner received at the DHO level and through the process as a whole.

Further, Petitioner argues that the BOP breached a mandatory general duty of care owed to all inmates pursuant to 18 U.S.C. § 4042. (Pet. at 6-7.) Petitioner is correct that the BOP owes general duties to its inmates and that a breach of those duties can expose the government to tort

---

[2] 28 C.F.R. § 541.7 is a recodification of 28 C.F.R. § 541.15, which the parties cite in their briefs.

liability. *See* 18 U.S.C. § 4042 (establishing the general duties that the BOP owes to its inmates); *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (discussing government liability for breach of these duties and the "discretionary function" exception under 28 U.S.C. § 2680(a) that often applies to claims for breach of general duty); *see also Muick v. Reno*, 83 Fed. App'x 851, 853 (8th Cir. 2003) (discussing same in a prisoner litigation context). However, Petitioner does not elaborate on which 18 U.S.C. § 4042 duty was breached, which BOP staff member breached it, or how the alleged breach caused Petitioner harm. (*See* Pet. at 6-7.) Despite our deference to pro se complainants, without the allegation of facts supporting a breach, this claim cannot survive. *See Stone v. Harry*, 364 F.3d 912, 914 (8th Cir. 2004) ("Though pro se complaints are to be construed liberally, they still must allege sufficient facts to support the claims advanced." (citation omitted)); *Cunningham v. Ray*, 648 F.2d 1185, 1186 (8th Cir. 1981) (per curiam) ("[E]ven pro se litigants must set [a claim] forth in a manner which, taking the pleaded facts as true, states a claim as a matter of law.") Therefore, Petitioner's mandatory-duty argument cannot succeed.

Finally, Petitioner argues that the DHO's order to rewrite the report rather than dismiss the case is evidence of personal involvement, regardless of whether the report was insufficient. The record contains no support for such an allegation. Instead, the DHO requested clarification in the report, and the DHO is permitted to ask for more investigation before hearing a matter, 28 C.F.R. §541.8. After the report was revised, Petitioner had yet another UDC hearing, and then the DHO reviewed his case. Thus, Petitioner's due process was preserved.

In conclusion, the DHO was an impartial decision-maker, and Petitioner's due process rights were not violated by improper partiality in the DHO's determination and sentencing.

**E.** **The BOP's Classification of Cellular Telephones as Hazardous Tools**

Petitioner argues that the BOP improperly classified cellular telephones as "hazardous tool[s]" within the meaning of Code 108. (Pet. at 6.) "The [BOP's] interpretation of its own regulation prohibiting possession of a hazardous tool is controlling unless it is plainly erroneous or inconsistent with the regulation." *Ward v. Terrell*, Civ. No. 08-837, 2008 WL 5273720, at \*9 (D. Minn. Dec. 17, 2008) (citing *Robinson v. Warden*, 250 Fed. App'x 462, 464 (3d Cir. 2007)). Code 108 provides that a "hazardous tool" is one

> most likely to be used in an escape or escape attempt or to serve as weapons capable of doing serious bodily harm to others; or those hazardous to institutional security or personal safety; e.g., hack-saw blade, body armor, maps, handmade rope, or other escape paraphernalia, portable telephone, pager, or other electronic device.

28 C.F.R. § 541.3. Courts consistently hold that classifying a cellular telephone as a Code 108 hazardous tool is appropriate where the DHO explained its reasoning. *See Goshay v. Fondren*, Civ. No. 08-5365, 2009 WL 490015, at \*5 (D. Minn. Feb. 26, 2009) (noting that the BOP has properly classified cellular telephones as hazardous tools and citing similar holdings from district courts in multiple circuits); *Ward*, 2008 WL 5273720, at \*9.

Here, the DHO report sufficiently established that the possession of a cellular telephone was a Code 108 violation. (*See* Groteboer Decl. Attach. I.) Utilization or even mere possession of a cellular telephone enables inmates to make unmonitored telephone calls to outsiders or other prisoners. (*Id.*) Such communication could be used to secretly coordinate a prison escape or engage in other activity that is hazardous to prison security or the personal safety of inmates. (*Id.*) Moreover, this categorization is consistent with the rest of the BOP's regulations because inmate telephone calls are monitored by BOP staff through the TRULINCS system. In addition, the warden published a notice within the prison that possession of a cellular telephone would constitute a Code 108 violation. This categorization is not plainly erroneous because it

17

corresponds with the special security demands needed to maintain order in a correctional institution. Therefore, the BOP properly classified cellular telephones as hazardous tools, and the DHO sufficiently established that possession of the Nokia constituted a Code 108 violation.

## III.   Conclusion

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.   Petitioner Mark Ramos's Petition for a Writ of Habeas Corpus (ECF No. 1) be **DENIED**; and

2.   This action be **DISMISSED WITH PREJUDICE**.

Dated: September 17, 2014                    *s/Jeanne J. Graham*

                                        JEANNE J. GRAHAM
                                        United States Magistrate Judge

## NOTICE

Pursuant to District of Minnesota Local Rule 72.2(b), any party may object to this Report and Recommendation by filing and serving specific, written objections by **October 6, 2014**. A party may respond to the objections within ten days after service thereof. Any objections or responses shall not exceed 3,500 words. The district judge will make a de novo determination of those portions of the Report and Recommendation to which objection is made. The party making the objections must timely order and file the transcript of any hearing unless the parties stipulate that the district judge is not required to review a transcript or if the district judge directs otherwise.